**NORTHWEST AIRLINES, INC.,**
Petitioner,

v.

**CIVIL AERONAUTICS BOARD,**
Respondent,

**Pan American World Airways, Inc. and Trans World Airlines, Inc., Intervenors.**

**MASTER EXECUTIVE COUNCIL OF TRANS WORLD AIRLINES PILOTS, Petitioner,**

v.

**CIVIL AERONAUTICS BOARD,**
Respondent,

**Trans World Airlines, Inc. and Pan American World Airways, Inc., Intervenors.**

**UNITED STATES of America, Petitioner,**

v.

**CIVIL AERONAUTICS BOARD,**
Respondent,

**Trans World Airlines, Inc. and Pan American World Airways, Inc., Intervenors.**

Nos. 75–1127, 75–1218, 75–1328.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 24, 1975.

Decided June 30, 1976.

Philip A. Lacovara, Washington, D. C., with whom James M. Verner, Michael J. Roberts, Thomas `A. Larsen and Jay Kelly Wright, Washington, D. C., were on the brief, for petitioner Northwest Airlines.

B. Barry Grossman, Atty., Dept. of Justice, Washington, D. C., with whom Howard E. Shapiro and Samuel R. Simon, Attys., Dept. of Justice, Washington, D. C., were on the brief, for petitioner U. S.

Glen M. Bendixsen, Associate Gen. Counsel, Litigation and Research, C. A. B., Washington, D. C., with whom James C. Schultz, Gen. Counsel, and Peter R. Steenland, Jr., Atty., C. A. B., Washington, D. C., were on the brief, for respondent. Thomas J. Heye, Gen. Counsel for the Civil Aeronautics Board at the time the record was filed, Washington, D. C., also entered an appearance for respondent.

Richard D. Mathias, Washington, D. C., for intervenor Pan American World Airways, Inc.; also argued for intervenor Trans World Airlines, Inc. James F. Bell and James M. Burger, Washington, D. C., entered appearances for intervenor Pan American World Airways, Inc. Edmund E. Harvey and Henry J. Oechler, Jr., New York City, were on the brief for intervenor Trans World Airlines, Inc.

Richard F. Watt, Chicago, Ill., was on the brief for petitioner Master Executive Council of Trans World Airlines Pilots.

Before DANAHER, Senior Circuit Judge, WRIGHT, Circuit Judge, and VAN PELT,* Senior District Judge.

PER CURIAM.

In response to a serious financial crisis threatening Trans World Airlines and Pan American World Airways, the Civil Aeronautics Board approved an agreement between the two carriers for temporary changes in some of the Transatlantic and Transpacific routes operated by each, including what amounted to exchanges of certain routes. Order 75–1–133 (January 30, 1975), JA 25, *reconsideration denied*, Order 75–2–108 (February 27, 1975), JA 50. The changes permit significant cost savings to both carriers and the Board was anxious to implement them speedily, before the financial situation deteriorated further. Therefore, although the route changes are fairly substantial, the Board acted under· sections of the Federal Aviation Act which ostensibly permit such changes without requiring modification of the carriers' certificates and also without holding an evidentiary hearing or submitting the final action to the President under Section 801(a) of the Act, 49 U.S.C. § 1461(a) (Supp. II 1972).[1]

The Board found that the financial situation of the two carriers, brought on in part by a sudden rise in fuel costs and an unforeseen drop in passenger traffic, was sufficiently serious to constitute "unusual circumstances" justifying a grant of temporary exemption authority under Section 416(b)(1), 49 U.S.C. § 1386(b)(1) (1970),[2] and to make temporary suspension of the rele-

---

* Of the United States District Court for the District of Nebraska, sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

1. Section 801(a) provides in pertinent part:

    (a) The issuance, denial, transfer, amendment, cancellation, suspension, or revocation of, and the terms, conditions, and limitations contained in, any certificate authorizing an air carrier to engage in overseas or foreign air transportation * * * shall be subject to the approval of the President. Copies of all applications in respect of such certificates· and permits shall be transmitted to the President by the Board before hearing thereon, and all decisions thereon by the Board shall be submitted to the President before publication thereof.

2. Section 416(b)(1) provides:

    (b)(1) The Board, from time to time and to the extent necessary, may [with an exception not relevant here] exempt from the requirements of this subchapter or any provision thereof, or any rule, regulation, term, condi-

vant routes "in the public interest" under Section 401(j), 49 U.S.C. § 1371(j) (1970).[3] It also found that the agreement could be approved under Section 412, 49 U.S.C. § 1382 (1970),[4] rather than under the more restrictive provisions of Section 408, 49 U.S.C. § 1378 (1970).[5]

The Board recognized, however, that it could act under these sections only as a temporary response to a crisis situation. It therefore provided that the exemption and suspension authority would expire either two years after issuance of the order or 90 days after final Board action in the *Transatlantic Route Proceeding*, Docket 25908, whichever period proved to be shorter. That proceeding, already well under way, was designed to consider permanent changes in Transatlantic routes, including several covered by the TWA–Pan Am agreement. Any changes adopted as a result of that proceeding will presumably be embodied in certificate modifications and will go to the President under Section 801.

Northwest Airlines and others challenged the Board's action here, complaining primarily that the Board failed to provide an evidentiary hearing and that the Board's action improperly circumvents the certification provisions which form the heart of the

tion, or limitation prescribed thereunder, any air carrier or class of air carriers, if it finds that the enforcement of this subchapter or such provision, or such rule, regulation, term, condition, or limitation is or would be an undue burden on such air carrier or class of air carriers by reason of the limited extent of, or unusual circumstances affecting, the operations of such air carrier or class of air carriers and is not in the public interest.
The Board's order here exempted the carriers to the extent necessary from the provisions of § 401, 49 U.S.C. § 1371 (1970), which provides in relevant part:
 *(a) Essentiality.*
  No air carrier shall engage in any air transportation unless there is in force a certificate issued by the Board authorizing such air carrier to engage in such transportation.
  \* \* \* \* \* \*
 *(e) Terms, conditions, and limitations.*
  (1) Each certificate issued under this section shall specify the terminal points and intermediate points, if any, between which the air carrier is authorized to engage in air transportation and the service to be rendered; and there shall be attached to the exercise of the privileges granted by the certificate, or amendment thereto, such reasonable terms, conditions, and limitations as the public interest may require.

3. Section 401(j) provides:
  No air carrier shall abandon any route, or part thereof, for which a certificate has been issued by the Board, unless, upon the application of such air carrier, after notice and hearing, the Board shall find such abandonment to be in the public interest. Any interested person may file with the Board a protest or memorandum of opposition to or in support of any such abandonment. The Board may, by regulation or otherwise, authorize such temporary suspension of service as may be in the public interest.

4. Section 412 provides in pertinent part:
  (a) Every air carrier shall file with the Board a true copy \* \* \* of every contract or agreement \* \* \* affecting air transportation and in force on the effective date of this section or hereafter entered into, or any modification or cancellation thereof, between such air carrier and any other air carrier, foreign air carrier, or other carrier for pooling or apportioning earnings, losses, traffic, service, or equipment, or relating to the establishment of transportation rates, fares, charges, or classifications, or for preserving and improving safety, economy, and efficiency of operation, or for controlling, regulating, preventing, or otherwise eliminating destructive, oppressive, or wasteful competition, or for regulating stops, schedules, and character of service, or for other cooperative working arrangements.
  (b) The Board shall by order disapprove any such contract or agreement, whether or not previously approved by it, that it finds to be adverse to the public interest, or in violation of this chapter, and shall by order approve any such contract or agreement, or any modification or cancellation thereof, that it does not find to be adverse to the public interest, or in violation of this chapter \* \* \*.
This section does not explicitly require a hearing.

5. Section 408 provides in pertinent part:
  (a) It shall be unlawful unless approved by order of the Board as provided in this section—
  \* \* \* \* \* \*
  (2) For any air carrier \* \* \* to purchase, lease, or contract to operate the properties, or any substantial part thereof, of any air carrier[.]
Under § 408(b) the Board must hold a hearing before approving any contract or arrangement which comes within § 408(a).

Act. Oral argument was heard on November 24, 1975. Shortly thereafter this court inquired of the Board when a final decision in the *Transatlantic Route Proceeding* could be expected. The Associate General Counsel replied that he could give no definite indication, but assured the court that the Board and staff were "expediting the cases." We have stayed our hand in the expectation that that decision would provide a final resolution to the issues presented here. But no decision has yet appeared, and we have decided it is appropriate to proceed now to treat the questions raised.

■■■ The Act clearly contemplates that significant shifts in airline routes will be implemented only after modification of the affected carriers' certificates under Section 401(g), 49 U.S.C. § 1371(g) (1970).[6] Such modifications can be authorized only after hearings and, in the case of overseas or foreign air transportation, must be submitted to the President under Section 801. The sections invoked here by the Board, however, do permit certain limited, temporary exceptions to these requirements in case of "unusual circumstances," as Section 416 styles it. We agree with the Board that the severe financial distress of the two major United States flag international carriers justified initial Board action under Sections 401(j) and 416(b)(1), and we agree that action properly taken under those sections is not subject to presidential review.[7] Moreover, we find that the agreement was properly considered under Section 412 rather than Section 408.

■■■ Temporary relief of this kind must, however, be limited to no more than is necessary to meet the crisis. As this court held in *Air Line Pilots Ass'n, Int'l v. CAB*, 148 U.S.App.D.C. 24, 27, 458 F.2d 846, 849 (1972):

The fact that Congress has established certification as the heart of the regulatory scheme requires that the words "to the extent necessary" in Section [416(b)(1)] be read as incorporating a temporal limitation on exemptions. Departure from the regulatory norm, in other words, is to be tolerated only so long as the circumstances warrant.

(Footnote omitted.) Similar principles apply to temporary suspensions under Section 401(j).

■■■ The Board's action in this case, leaving the temporary changes in place for up to two years without any opportunity for opposing parties to present their objections at an evidentiary hearing, went too far. The temporary changes should have been implemented only until such time as the Board could complete narrowly focused, expedited proceedings—including proper notice and hearing—looking toward a decision on permanent changes in certificate authority. Such proceedings should generally be carefully limited to consider only the precise interim changes granted. And the Board should assign sufficient personnel to guarantee speedy consideration. (This was, after all, an emergency, at least in the eyes of the Board and the two carriers.) Had the Board done this, the temporary route changes would have been in effect during the pendency of the proceedings, thus affording immediate relief to the distressed carriers, but the opposing parties would have been given an early opportunity to challenge the changes at a full hearing. If the Board saw fit after the hearing to make any of the route changes permanent, the resulting certificate modifications would be presented to the President for his review. *See* Executive Order No. 11,920, 12 Weekly Compilation of Presidential Documents 1040

---

6. Section 401(g) provides in pertinent part:

   The Board upon petition or complaint or upon its own initiative, after notice and hearings, may alter, amend, modify, or suspend any such certificate, in whole or in part, if the public convenience and necessity so require * * *.

   *See also* §§ 401(a), (e)(1), quoted in note 2 *supra*.

7. It is established that a grant of temporary exemption authority under § 416(b) is not subject to presidential review. *Pan American World Airways, Inc. v. CAB*, 104 U.S.App.D.C. 288, 290, 261 F.2d 754, 756 (1958), *cert. denied, sub nom. Seaboard & Western Airlines, Inc. v. CAB*, 359 U.S. 912, 79 S.Ct. 589, 3 L.Ed.2d 575 (1959).

(June 10, 1976) (establishing procedures for presidential review of CAB decisions).

The Board failed to limit its order in this fashion and has made no move toward initiating further expedited proceedings. By now, approximately 17 months after the Board's order went into effect, there can be no claim that the authority granted still serves merely as an interim response to emergency conditions. The situation here is much like that facing the court in *United States v. CAB*, 167 U.S.App.D.C. 313, 323–324, 511 F.2d 1315, 1325–1326 (1975). We there upheld the Board's approval, without a hearing, of a capacity reduction agreement reached by the major carriers in 1973 as an emergency response to sudden and severe fuel shortage problems. But we disallowed similar Board approval of a comparable 1974 agreement, since by then there had been ample time for full investigation and hearings on all controverted issues.

██ We therefore vacate the Board's order as exceeding the Board's authority under Sections 401(j) and 416(b)(1), and remand the case to the Board. However, the carriers and the Board have relied in good faith on the validity of that order in planning their operations.[8] Accordingly, we stay for 60 days the effect of that portion of our order vacating the Board's action so that there might be an orderly transition back to route authority as it existed prior to January 30, 1975. If the Board sees fit, it is certainly free now to use this period for holding expedited proceedings looking toward permanent changes in certificate authority. And naturally our action is without prejudice to any changes that may properly be implemented as a result of the *Transatlantic Route Proceeding*.

*So ordered.*

8. We note as well that a motions panel of this court denied on February 28, 1975 a requested stay of the Board's order pending the outcome of our review.