DELTA AIR LINES, INC., National Airlines, Inc., Petitioners,

v.

CIVIL AERONAUTICS BOARD, Respondent,

Eastern Air Lines, Inc., Intervenor.

No. 71–1515.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 1, 1971.

Decided Dec. 1, 1971.

---

Mr. Robert Reed Gray, Washington, D. C., with whom Messrs. James W. Callison, Atlanta, Ga., and Benjamin R. Achenbach, Jr., Washington, D. C., were on the brief, for petitioner Delta Air Lines, and Mr. Andrew T. A. Macdonald, Washington, D. C., was on the brief for petitioner National Airlines, Inc.

Mr. Warren L. Sharfman, Associate General Counsel, Litigation and Research, with whom Messrs. R. Tenney Johnson, General Counsel, and O. D. Ozment, Deputy General Counsel, Civil Aeronautics Board, were on the brief, for respondent.

Mr. Philip A. Fleming, Washington, D. C., was on the brief for intervenor Eastern Air Lines, Inc.

Mr. Howard E. Shapiro, Atty., Department of Justice, entered an appearance for respondent.

Before BAZELON, Chief Judge, and McGOWAN and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

Petitioners seek review of an order of the Civil Aeronautics Board [1] of 24 June 1971 dismissing the complaints of Delta Airlines, Inc., and other carriers regarding the new conditional reservation tariff filed by Eastern, to become effective 1 July 1971 for a nine-month experimen-

1. Order 71-6-120.

tal period. On its facts this case is simple, and presents essentially two issues:

1. Is the "conditional reservation" tariff of Eastern Airlines unjustly discriminatory in contravention of §§ 404(a) and (b) of the Federal Aviation Act of 1958?[2]

2. Did the Civil Aeronautics Board abuse its discretion by failing to grant petitioners a hearing and an investigation before allowing the experimental tariff to go into effect for the nine-month period?

We find the answers to both issues in the negative, and deny petitioners' request.

## I.

■ In an effort to ameliorate the perennial no-show problem of the airlines—and to reduce the temptation of the airlines deliberately to overbook on each flight—Eastern proposed and has put into effect a conditional reservation tariff. In essence, instead of the conventional two types of tickets, on each Eastern flight there are now three regular tariffs available to all prospective passengers—(1) first, (2) coach, and (3) conditional, which Eastern markets under the name "Leisure Class."[3] In contrast to the first or coach class passenger who pays his fare and receives a confirmed reservation, thus being assured of a seat on his desired flight (unless the airline deliberately or inadvertently overbooks), the conditional reservation passenger pays the regular coach price but does not get a confirmed seat. He goes to the airport twenty minutes before the flight and in effect for that particular flight is a preferred stand-by. If there is coach seating available after all the regular coach reservation passengers have been boarded, the conditional fare passenger will be accorded a coach seat on the flight. If there are no coach spaces to accommodate the conditional reservation passenger, but there are open first class spaces, the conditional passenger will be flown in first class, at no extra charge. If he cannot be accommodated in either first class or coach on his desired flight, Eastern will tender the passenger a refund for the coach fare amount to the first point of stopover or interline connecting point, or, if there is no such point, to the passenger's destination. Most importantly, and herein lies the charm to the traveling public, if the conditional reservation passenger does not get on his flight, Eastern will also provide transportation at no charge in the next available seat, coach or first class.

On any given flight, the order of boarding is first and coach passengers with confirmed reservations, confirmed passengers from previous flights who have been "bumped" because of overbooking, conditional fare passengers to the extent of available seats, and, assuming there are still vacant seats, standbys who may or may not have purchased a ticket prior to departure.

There is no assurance that the conditional fare passenger will be seated on the flight of his choice, even though he is at the airport and ready to board; but he is assured of two things as an alternative: (1) a seat on the next available Eastern flight, and (2) the refund of his ticket price for that portion of the journey which has been delayed. All of these possibilities are known to the conditional fare passenger before he buys his conditional fare ticket; conditional fare tickets are available on the same terms to every member of the traveling public, as are first class and coach tickets.

Eastern asserts that its conditional fare will greatly ameliorate the loss to all airlines because of no-shows, and likewise eliminate the inconvenience to passengers because of deliberate or inadvertent overbooking of a given flight. The number of conditional fares which

---

2. 49 U.S.C. §§ 1374(a) and (b).

3. See Eastern Air Lines Conditional Reservation Tariff Rule, Appendix, pp. 2–3, Order 71–6–120, Appendix, p. 84.

will be sold on any given flight is determined by the computerized history of no-shows on a given Eastern flight on the particular day of the week. For example, if the number of no-shows on the flight historically is 5%, then close to that percentage of the seats will be sold as conditional fare seats.[4] If history repeats itself exactly on every given flight, 5% would be no-shows and those confirmed but vacant seats would be filled or nearly filled by the 5% conditional fare passengers. Eastern argues there will thus be less temptation for the airline to overbook, but if inadvertently there should be overbooking, those confirmed reservation passengers would be accommodated ahead of the conditional fare passengers, who under their contract would be relegated to a later flight and would secure a refund of their ticket for the inconvenience of the delay.

Petitioners emphatically urge that the conditional fare is inherently discriminatory, and point to the undeniable fact that on any given flight there may be passengers enjoying the same class service who have paid differing amounts of money or no money at all. Taking the most extreme example offered, in first class there may be (1) first class passengers who have paid full first class fares, (2) first class passengers who started out as conditional fare passengers on that flight but who paid only coach fares, and (3) first class passengers who started as conditional fare passengers on a previous Eastern flight but who after being delayed are now traveling free. To which we might add, under the conventional system prior to the inauguration of the Eastern experimental tariff, first class passengers who have paid full first class fares on a previous flight, but who have been "bumped" because the flight was oversold, and now are going on a delayed flight.

Although petitioners emphatically urge that this situation is obviously and undeniably discriminatory against those who have paid the full first class fare (or coach fare, as the case may be) yet we do not view it in this light at all. We think that with Eastern's plan there are now simply three different contracts, each embracing a different set of rights and obligations. It seems to us that each first class, each coach class, and each conditional fare class passenger—and all three tariffs are equally available to every member of the traveling public[5]—purchased the ticket of his choice knowing the contract conditions attached thereto and the consequences which might conceivably ensue on any given flight. The first class passenger who buys a confirmed reservation knows that he is going to get a first class seat. If a conditional fare passenger winds up in the first class seat beside him, after having not been allowed to board a previous Eastern flight, then this conditional passenger is there because he bought a conditional fare ticket and suffered the inconvenience of a delay in his flight plans. If on the other side of our confirmed first class passenger there is a conditional reservation passenger whose reservation was for the same flight, he is there because he was willing to take the risk of not getting on that flight at all. The confirmed first class passenger had the same opportunity to buy the conditional fare ticket that the conditional fare passengers who are riding in first class did.

Essentially, each member of the traveling public has an option to purchase three different ticket contracts; each ticket is a separate and distinct bundle of contract rights and obligations; the consequences which ensue in any given

---

4. It is Eastern's plan to set the number of conditional reservations lower than the historic no-show percentage, in order that very few conditional reservation passengers will not be accommodated on their preferred flight. Appendix p. 74.

5. Cf. Transcontinental Bus System, Inc. v. CAB, 383 F.2d 466 (5th Cir. 1967), in which youth and young adult fares were held discriminatory because they were not equally available and there was no valid reason for the distinction in price.

**1344**

traffic situation are consequences inherent in, defined in, and foreseeable under the contract terms the passenger actually purchases. We do not find the conditional fare tariff discriminatory under the Act. *Transcontinental Bus System, Inc. v. CAB.*[6]

## II.

■ Nor is the petitioners' second argument, that the CAB abused its discretion by failing to grant Delta a hearing and an investigation, any stronger. At least three reasons preclude this court from so holding.

1. Under the Act, the CAB is not empowered to suspend a filed tariff without an investigation and a hearing.[7] Since this is purely an experimental tariff, and admittedly a novel and ingenious proposal resting so far on a theoretical rather than an empirical basis, the CAB in reality is not able to investigate without testing how this experimental tariff actually works. As Judge Leventhal wrote in *American Airlines, Inc. v. CAB,* "It is the kind of issue where a month of experience will be worth a year of hearings."[8]

2. Section 1002(a) provides in part:

Whenever the Administrator or the Board is of the opinion that any complaint does not state facts which warrant an investigation or action, such complaint may be dismissed without hearing.[9]

Petitioners rely on *Trailways of New England v. CAB*[10] to hold that when a prima facie case of discriminatory rates is shown, if the CAB dismisses the complaint without a hearing under § 1002(a), it must state its reasons therefor with reference to the relevant facts. Assuming petitioners' reading of *Trailways* is correct, the Board here did give reasons for its refusal to act on the complaint and to grant a hearing at this time. For example,

For a number of years, the no-show passenger has been a vexing problem for which no adequate solution has yet been devised. Eastern has proposed a novel method of dealing with the problem which in our judgment has sufficient promise as to warrant the experimentation for the nine-month trial period proposed by Eastern. If successful, Eastern's proposal should tend on the one hand to reduce the number of denied boardings to holders of confirmed reservations, while on the other hand reduce the number of empty seats operated on peak flights related to passenger no-shows. While the complainants have raised a number of practical problems with the proposal, we believe that the workability of the proposal can only be ascertained through actual experimentation.[11]

3. In its refusal to conduct a hearing at this time, and in its decision to "investigate" by permitting the experimentation with this tariff for nine months, the Board has made a policy decision of the type it was created to make.[12] We

---

6. *Id.*

7. Federal Aviation Act of 1958, Section 1002(d), 49 U.S.C. 1482(d).

8. 123 U.S.App.D.C. 310, 359 F.2d 624, at 633 (1966).

9. 49 U.S.C. 1482.

10. 412 F.2d 926 (1st Cir. 1969).

11. Appendix, p. 86.

12. It is worth noting that petitioners and several other airlines have defensively filed an exact equivalent conditional fare tariff, so the experience of those airlines, not just Eastern's, will be available at the end of the nine-month period for the Board's consideration. Delta additionally complains that Eastern is using a copyrighted marketing label, "Leisure Class," to describe its conditional fare tariff, which Delta and the other airlines may not be able to duplicate because of the copyright laws, even though they offer the identical conditional tariff and service. This may or may not be correct; if it is, perhaps under the free enterprise system there is an incremental reward to those who think of an idea first.

think this case falls within the administrative law doctrine of primary jurisdiction, and we should decline to pass upon the rate until after the period of experimentation. We think that the resolution of the issues here involved has been "placed within the special competence" of the CAB, and in such a case the judicial process should be suspended pending the resolution of these issues by the administrative body.[13]

Furthermore, as we most recently said in Municipal Light Boards of Reading and Wakefield, Massachusetts v. Federal Power Commission, "It is settled that the refusal to suspend a filed rate is a nonreviewable exercise of agency discretion. (Citing authorities.)" As there, our ruling here "is in the context of the kind of claim presented to us —that there has been an abuse of agency discretion."[14] As Judge Robb wrote earlier this year in Associated Press v. Federal Communications Commission, "We start with the premise that we have no authority to order an additional suspension when, as in this case, the Commission has suspended a tariff for the maximum period allowed by statute. . . . Nor may we review a refusal to suspend. (Citing authorities.)"[15]

We think the same principles apply in the case at bar.

For the above reasons, we decline to reverse the order of the Civil Aeronautics Board dismissing petitioners' complaint.

Affirmed.

13. United States v. Western Pac. R. Co., 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). *See generally* 3 K. Davis, Administrative Law Treatise § 19.01 (1958) ; L. Jaffe, Judicial Control of Administrative Action 150 (Student Edition, 1965).

14. 1971, 146 U.S.App.D.C. 294, at p. 304, 450 F.2d 1341, at p. 1351.

15. 1971, 145 U.S.App.D.C. 172, at p. 180, 448 F.2d 1095, at p. 1103. See also Judge

McGowan, most recently, in another aviation case, "The FAA is the agency entrusted with the administration of the statute, and is familiar with the practical problems of its enforcement. Since the agency's resolution of the problem is not irrational, we leave its action undisturbed." Airline Pilots Association International v. Federal Aviation Administration (1971), 147 U.S.App.D.C. ——, at p. ——, 454 F.2d 1052, at p. 1055.